EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant,

v.

FRONTIER AIRLINES, INC., Defendant-Appellee.

No. 80–1910.

United States Court of Appeals, Tenth Circuit.

March 29, 1982.

Raymond R. Baca, Atty., Equal Employment Opportunity Commission, Washington, D. C. (Leroy D. Clark, Gen. Counsel, Philip B. Sklover, Acting Associate Gen. Counsel, Vella M. Fink, Acting Asst. Gen. Counsel, William H. Ng, Atty., Equal Employment Opportunity Commission, Washington, D. C., with him on the brief), for plaintiff-appellant.

James E. Hautzinger, Sherman & Howard, Denver, Colo. (Joseph J. Bronesky, Theodore A. Olsen, Sherman & Howard, Denver, Colo., with him on the brief), for defendant-appellee.

Before McWILLIAMS, DOYLE and SEYMOUR, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The issue in this case is whether the appellant was the victim of age discrimination growing out of the refusal of Frontier to hire him and give back pay for a three-year period during which his employment was pending.

The trial court found and concluded that Frontier had not violated the Age Discrimination in Employment Act (ADEA) of 1967, 29 U.S.C. § 623 *et seq.*, and Section 16 and 17 of the Fair Labor Standards Act of 1938, 29 U.S.C. § 215 *et seq.*

The case is marked by a most unfortunate succession of events which started in June, 1974, at which point Guilbault filed an updated application for flight crewman for Frontier. He had previously filed an application in 1971 soon after completion of 20 years of service in the United States Air Force as a pilot of fighter and multi-engine jet transports. He had acquired approximately 6,300 hours of flying time. He received no response from his first application. His application had been destroyed after one year.

His 1974 application .was reviewed by George J. Schleifer who, having found him qualified, called him in for an interview. On June 17, Schleifer verified the applicant's flight time as being authentic, and pursuant to Frontier's procedures for screening pilot applicants, Schleifer referred Mr. Guilbault to two members of the

Flight Operations Department, Kenneth Daely and Andrew Hoshock, for a further interview. All of them found Guilbault to be highly qualified and recommended that he be hired, subject, of course, to the Frontier physical examination, which was supposed to be more difficult than the FAA one.

Guilbault was notified of this decision and given the option of entering the July 1, 1974 or the July 8, 1974 training class for new pilots. Guilbault had planned a vacation which was to end July 1, and so he chose the July 8, 1974 class. He was told by Schleifer that his entrance in that class would be contingent upon his passing the physical examination.

All pilots seeking employment with Frontier Airlines had to pass a demanding physical examination. It was essential to entering in the training class. This physical examination included medical history, measurements of height, weight, blood pressure, electrocardiogram, chest x-ray and an analysis of blood samples.

Guilbault's physical was scheduled for July 3, 1974, and was to be given by Dr. J. R. Becky, the Medical Director for Frontier Airlines. Ordinarily such an examination would be scheduled about two weeks prior to the commencement of the class, but Guilbault's vacation plans made this impossible.

On July 3, 1974, the time of the physical, Guilbault held a Class I FAA medical certificate which had been issued on December 17, 1973. Dr. Becky, in conducting the physical examination, determined that Guilbault had nasal polyps which had been removed in the past and which Mr. Guilbault believed had grown back. He had a high frequency ringing in his ears, and he was allergic to ragweed, mesquite hops and mold. Moreover, he had taken desensitization shots for allergies. Dr. Becky noted that Mr. Guilbault made occasional sniffling noises during the physical examination, and seemed to have shortness of breath. He examined Guilbault's nose and detected a polyp and some irritation around it. Therefore, he determined that consultation with an ear, nose and throat specialist would be

in order. According to FAA regulations, the existence of polyps may or may not be a condition for denying a medical certificate. It is up to the discretion of the physician based upon the results of further history, evaluation and tests.

On July 3, 1974, Becky informed Guilbault that the laboratory work would have to be sent out, that the EKG would be sent to a cardiologist, and that the chest x-ray would be read by another specialist. On that same day Guilbault's EKG was mailed to a doctor and the blood samples were sent to the Upjohn Laboratories. No work was done on Guilbault's physical examination on July 4, 1974. On July 5, 1974, Dr. Becky learned that the EKG could not be read on that day because the cardiologist was out until the following Monday. The examination of the chest x-ray disclosed the presence of a slight abnormality which could conceivably have been a tumor. It was recommended by the radiologist that the x-ray be done over again. On July 5, Becky received a call as to the results of the analysis of blood. This presented some unexpected consequences with certain elements exceeding normal limits, indicating possible hepatitis or cirrhosis of the liver. Becky concluded that the blood tests were erroneously evaluated by the Upjohn Laboratories. He was of the opinion that the tests and the chest x-ray ought to be redone to determine whether the initial results reflected medical problems. This prevented Guilbault from joining the July 8, 1974 class.

On July 5th, Guilbault called Dr. Becky's office and accused him of conspiring with the airlines to keep him from getting the job. Dr. Becky made an attempt to explain why his clearance was being held up. Guilbault's response was that he was going to take a physical examination in Colorado Springs. He said that Becky's explanation as to why he had not been certified was the equivalent of phony. In any event, all of the abnormalities that were supposedly discovered eventually proved not to be present.

Dr. Thomas Kirk, a specialist in occupational and aerospace medicine, testified that the elevated L.D.H. level indicated by Guilbault's first blood test, could have resulted from hemolysis or destruction of red blood cells due to shaking the test tube in the lab. Dr. Kirk was of the opinion that Guilbault was physically fit for flying. Dr. Becky's failure to certify him, however, was due wholly to his belief that there were outstanding problems that had not been cleared.

On July 8th, the blood tests were repeated by St. Joseph's Hospital and were found to be within normal limits. So Guilbault was cleared on July 9th, the day after his assigned class began. A representative of the United States Department of Labor sought assurances that Guilbault would be placed in the next pilot training class expected to be in September or October. He requested a letter guaranteeing that Guilbault would be in the next class. The letter was written and it said that if the class was held after January 1, 1975, it would only be necessary for Guilbault to have his weight, blood pressure and blood count checked by Dr. Becky. The Department of Labor said that this was a resolution of the matter. Due to an economic downturn, however, the next new pilot training class did not take place until 1977.

In the Spring of 1975, the Department of Labor made additional demands on Frontier Airlines to take care of the dispute, and asked that Guilbault be hired immediately and that he be given back pay to July 8, 1974, together with retroactive seniority. Frontier refused these demands on the grounds that no action taken constituted discrimination on the basis of age, and that the Department of Labor was attempting to change the terms of the prior agreement as to the disposition of Guilbault's case. There were approximately eight people in the same category as Guilbault as of July 8, 1975. In other words, they had been certified as medically qualified and had been promised a position, but were unable to start a new pilot training program.

A position was tendered to Guilbault in 1977, but he refused it, even though Frontier did not insist that his acceptance of the job be contingent upon his abandoning any back pay and seniority claims which he may have had.

The evidence shows that most of the pilots who were hired by Frontier were age 30 or below, and only one was over 40 when hired. Over a five year period, all were 35 or below. But this does not have any significance here, because Frontier did offer plaintiff a job. In the absence of evidence that the medical problems were fabricated by Frontier to avoid hiring Guilbault it cannot be said that there was discrimination.

The trial court acknowledged that the plaintiff had made out a *prima facie* case in accordance with *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Guilbault was over 40 at the time of his application with Frontier; he applied and was qualified for a pilot job at a time when Frontier was hiring in this position; he was refused admission to the class, and his place in that class was filled by another applicant. However, the counterbalancing feature is that Frontier at all times showed a desire to employ the plaintiff Guilbault. The decision was not to refuse to hire him, but rather to merely postpone his hiring until he cleared the physical. It is undisputed that he failed the first time around to complete all elements of the physical required for certification.

It may well have stemmed from Guilbault's decision to go on a vacation. This postponed the physical and created the problems associated with trying to complete the physical in a very short time. If Guilbault had not had to go on a vacation at the critical time, he would have been in on the July 1 or, at worst, the July 8, 1974 class. His contention that the physical examination was conducted in a way designed to prevent his going on duty or being finally hired is unsupported by any evidence. The explanatory reasons articulated by Frontier must be held to have been genuine and not pretextual. Frontier came forward with sufficient proof of non-discriminatory rea-

sons for failure to include Guilbault in the July 8, 1974 class. *Compare Mistretta v. Sandia Corporation*, 649 F.2d 1383, 1390 (10th Cir. 1981) (insufficient proof of non-discriminatory reasons for layoffs of four employees; evidence of inherent bias in employer's ranking system.) Accordingly, it satisfied the requirement of *McDonnell Douglas, supra.* There is no evidence that any hiring and employment of pilots followed any different pattern or practices or other proof to any intent to discriminate against persons over 40. *Compare Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (existence of objective factors for distinguishing among personnel sufficient but not necessary to refute discrimination claim.)

The trial court held that the complaint of Guilbault was not finally established, and directed the entry of judgment in favor of Frontier.

## I.

### DID FRONTIER OFFER ADEQUATE PROOF OF LEGITIMATE NON–DISCRIMINATORY REASONS FOR FAILURE TO INCLUDE GUILBAULT IN THE JULY 8, 1974 CLASS?

 We are of the opinion that the proof was sufficient. The EEOC argues that despite the innocent appearing medical information processing problems that prevented Guilbault from joining the July 8 class, Frontier intentionally discriminated against him; the medical certification objection to his commencement was merely a pretext for age based discrimination.

The EEOC also points out that Guilbault had a superior record in the Air Force, including 6,300 hours of flight time, and that he was more qualified than most of the other applicants. Yet he was not considered for a position until after the Department of Labor pressured Frontier, and his place in the training classes was given away to a younger pilot with far less experience, after Guilbault was unable to be medically certified in time.

Also emphasized are the facts that Guilbault was assigned for a physical examination just two business days before the start of the class, and that Frontier's trainees were usually given physical examinations at least two weeks before the start of the class. Also noted by EEOC is that the problematical lab test results that prevented the certification of Guilbault were readily identifiable as processing error, and that Becky could have gotten the consultations and other supplemental information needed much more quickly than the record shows that he did.

Frontier's argument in response to that is that factors unrelated to age discrimination prevented Guilbault from beginning a training class. Due to the fact that he took a vacation his examination had to be scheduled on two business days before the class began. Dr. Becky was wholly unaware that Guilbault had complained earlier that Frontier was discriminating against him. Becky merely exercised reasonable medical prudence in holding up medical certification of Guilbault until the problems were cleared. This was not the first time that Frontier had prevented pilot trainees from beginning classes due to non-completion of medical processing. Frontier did not hesitate to put Guilbault in the next class, having no knowledge that three years would elapse before the next class convened.

As suggested earlier we agree with the trial court that Frontier presented sufficient evidence of nondiscriminatory reasons for preventing Guilbault from starting the July 8, 1974 class. *Mistretta v. Sandia Corp., supra,* at 1390 (sufficient evidence presented to show that one employee was laid off for nondiscriminatory reasons.)

## II.

### WAS FRONTIER'S LETTER WHICH PROMISED TO PLACE GUILBAULT IN THE NEXT CLASS AN UNFORCEABLE SETTLEMENT THAT BARRED ANY SUBSEQUENT DISCRIMINATION ACTION?

 It is the contention of the EEOC that the letter was not a settlement; the

letter was addressed to the Department of Labor and not to Guilbault, and was too indefinite in its terms. For example, when is "the next training class?" It could hardly be regarded as an enforceable contract according to the EEOC. The letter did not even address important issues such as Guilbault's seniority and back pay and failed to mention any waiver of rights under the AEDA by Guilbault.

Frontier contends that the letter was a valid settlement. As an enforceable promise to include Guilbault in the next class, whenever it was, it was sufficiently definite to bind Frontier in a contractual sense.

Even assuming the letter did not at first function as a binding waiver of Guilbault's rights under the AEDA, Guilbault ratified the contract in 1977, when he expressed interest in participating in the May, 1977, class, but refused to be interviewed again because the letter provided that no interview was necessary. Frontier made good on the settlement by offering to place Guilbault in the May, 1977 class. Guilbault's refusal to participate based on disputes on the amount of back pay was not attributable to any breach of the settlement terms by Frontier.

## III.

## IS THE STATUTE OF LIMITATIONS TWO YEARS OR THREE?

## IN OTHER WORDS, WERE FRONTIER'S ACTIONS WILLFUL?

■ EEOC maintains that Frontier's violation of the AEDA was willful, and that therefore the three year statute of limitations applies to the maintenance of this suit. EEOC cites Frontier's knowledge of the age discrimination statute and its pretextual displacement of Guilbault from the training class in spite of that knowledge.

Frontier maintains that the court was right in finding that any violation that might have taken place was not willful. The medical certification problem was not a pretext to cover up intentional discrimination, and Frontier showed its good faith by offering to place Guilbault in the next class immediately after his displacement from the July 8, 1974 class.

It is our conclusion that the trial court reached the correct result. There is not the slightest evidence that this medical certification delay was in the nature of a put-up job, as was indicated above. In fact, Frontier at all times showed a desire to place Guilbault in the next class. This began immediately after his displacement from the July, 1974 class, and thereafter, through 1977, when the offer of a job was made. Hence a finding of a willful violation of the ADEA by Frontier is inappropriate.

In conclusion there are two factors which lend strength to the trial court's evaluations and conclusions.

*First* is the decision of plaintiff to go on a vacation during the time period just prior to the classes. This made it necessary for him to be in the July 8th class. The end result was that there was a shortage of time for the completion of tests.

*Secondly*, Frontier did not at any time reject the appellant. Frontier offered him a position once his physical cleared and renewed it at the time that a class was to be held. Moreover, this was without prejudice to allowing appellant to continue to assert his claim for back pay.

In our opinion there is no possible basis which could justify a reversal of the trial court's findings.

Accordingly, the judgment of the district court is affirmed.